UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOHN F. OAKES, JR.

              Plaintiff,

                        **REPORT AND RECOMMENDATION**
                        **06-CV-00332 (LEK)**

MICHAEL J. ASTRUE[1]
COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

# Jurisdiction

1.      This case was referred to this Court by Chief Judge Norman A. Mordue, pursuant

to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3.  This case has

proceeded in accordance with General Order 18 of this Court which sets forth the

procedures to be followed when appealing a denial of Social Security benefits.  Both

parties have filed briefs.  For the reasons discussed below, I recommend that the matter

be remanded.

# Background

2.      Plaintiff John F. Oakes, Jr. challenges the Administrative Law Judge's ("ALJ")

determination that he is not entitled to Disability Insurance Benefits ("DIB") or

Supplemental Security Income ("SSI"), under the Social Security Act ("the Act").

Plaintiff alleges that he was disabled from August 5, 2001, because of mild mental

retardation, varicose veins of both legs status post surgical stripping, obesity, and

---

[1] On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of the Social Security
Administration.  Pursuant to Federal Rules of Civil Procedure 25(d)(1), he is automatically substituted for
former Commissioner Jo Anne Barnhart as the defendant in this action.

median neuropathy.  In denying Plaintiff's claim, the ALJ found that during the time period in question, Plaintiff was able to perform his past work as a job sorter in a paper processing company, as it was generally performed in the national economy (R. at 20).[2] Plaintiff has met the disability insured status requirements of the Act at all times up until December 31, 2001.[3]

## Procedural History

3.      Plaintiff protectively filed for DIB and SSI on March 27, 2002 (R. at 27, 221, 45). Both claims were denied on August 7, 2002 (R. at 27, 221).  Following a hearing, the ALJ issued a decision on October 28, 2003, in which he found that Plaintiff had not met the requirements for disability (R. at 21).  Plaintiff's request for review by the Appeals Council was denied on February 24, 2006 (R. at 5-7).

4.      On March 15, 2006, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court review the decision of the ALJ pursuant to Section 405(g) and 1383(c)(3) of the Act, modify the decision of Defendant and grant DIB and SSI to Plaintiff for the period beginning August 5, 2001.[4]  Defendant filed an answer to Plaintiff's complaint on July 21, 2007, requesting the Court to dismiss Plaintiff's complaint.  Plaintiff submitted a Memorandum of Law (hereinafter called "Plaintiff's Brief") on October 4, 2006.  On January 23, 2007, Defendant filed a Memorandum of Law in Support of His Motion (hereinafter called "Defendant's Brief") for Judgment on

---

[2] Citations to the underlying Administration are designated as "R."
[3] Both the ALJ and Plaintiff state that the date last insured was December 31, 2006 (R. at 15); Plaintiff's Brief, pp. 2.  However, the record states that Plaintiff's last date insured was in fact December 31, 2001 (R. at 27, 221).
[4] The ALJ's October 28, 2003, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.

the Pleadings[5] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

# Facts

### Medical Examiners

5.      Plaintiff was admitted to University Hospital on August 7, 2001, after his wife found him disoriented and unable to recognize household objects (R. at 166).  While at the Hospital, Plaintiff underwent an electroencephalogram ("EEG") to "look[] for any seizure activity" (R. at 164); *Dorland's Illustrated Medical Dictionary*, 601 (31st ed. 2007).  Dr. Santana, the physician conducting the test, found the test showed a "[n]ormal awake and briefly drowsy electrocardiogram"[6] (R. at 164).  Plaintiff also underwent a computed topography ("CT") scan of his head while at the Hospital (R. at 176); *Dorland's* at 448.  Dr. Lieberman, the physician conducting the exam, found "1.  Ventricular system within normal limits.  2.  No evidence of extra-axial fluid collection and intracranial hemorrhage.  3. No focal areas suggestive of acute infarction."  Id.  Plaintiff also underwent a magnetic resonance angiography ("MRA") scan of his head (R. at 177); *Dorland's* at 1203.  Dr. Swarnkar, the physician conducting the exam, found it to be normal.  Id.  Plaintiff also underwent a magnetic resonance imaging ("MRI") scan (R. at 178).  That scan was conducted by Resident Dr. Kwasniewski.[7]  Id.  Dr. Kwasniewski

---

[5] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceedings as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

[6] It appears that reference to an "electrocardiogram" is an erroneous reference to the electroencephalogram conducted by Dr. Santana.

[7] The record indicates that Resident Dr. Kwasniewski completed the exam, but it was reviewed by the Attending physician, Dr. Swarnkar (R. at 178).

found "[n]onspecific areas of high signal within the preventricular and subcortical white matter.  A small cortical lesion in the inferior frontal lobe representing a small infarct or contusion."  Id.  Plaintiff's final exam was an MRA of his neck, again conducted by Dr. Kwasniewski[8] (R. at 179).  Dr. Kwasniewski found "[m]ild atherosclerotic disease of the left internal carotid artery.  No hernodynamically significant stenosis seen."  Id.  Plaintiff was discharged the following day with the diagnosis of transient global amnesia (R. at 108).  Plaintiff was told to follow up with the neurology clinic (R. at 109).

Plaintiff was back at University Hospital on August 10, 2001, "complaining of [a] burning sensation in the middle of both calves on the medial aspect" (R. at 165).  Dr. Pipas, the physician with whom Plaintiff met, found "massive varicose veins."  Id.  Dr. Pipas noted that Plaintiff had previously been instructed to wear compression stockings, but Plaintiff was noncompliant.  Id.  Dr. Pipas wrote another prescription for the stockings.  Id.

Plaintiff met with Layne Sandridge[9] on October 4, 2001, at the Oswego VA Clinic[10] (R. at 120).  Plaintiff complained that he was unable to work because his legs hurt too much.  Id.  Ms. Sandridge found severe varicosities on Plaintiff's left leg below the knee and "a single varicosity on the posteromedial aspect of the calf."  Id.  Ms. Sandridge recommended a varicose vein study and surgery.  Id.

---

[8] The record indicates that Resident Dr. Kwasniewski completed the exam, but it was reviewed by the Attending physician, Dr. Swarnkar (R. at 179).
[9] The record does not indicate what type of medical source Ms. Sandridge is, except to suggest she works in the vascular surgery clinic at the VA clinic (R. at 120).
[10] The index for the record states that pages 110-121 are from the Oswego County Clinic and pages 181-189 are from the Oswego Clinic.  However, Plaintiff did not mention either of these facilities in a report he filled out to request a hearing (R. at 86-87).  Instead, he listed a Dr. Hannah and the VA Medical Clinic as his physicians.  Id.  Because there are various references to the VA, for the medical records in question, this Court assumes that those records are from the Oswego VA Clinic (R. at 121, 181-185).

On October 9, 2001, Plaintiff met with Dr. Magsino, at the VA Clinic, complaining of weakness and pain in his legs as well as sharp pain in his elbows (R. at 119).  Dr. Magsino wished to rule out carpel tunnel syndrome.  Id.  Plaintiff's current medications of Aspirin and ibuprofen were continued (R. at 120).

On October 24, 2001, Plaintiff met with Resident Dr. Rashid at the VA Clinic, as a follow up to his hospital visit on August 7, 2001 (R. at 115).  Dr. Rashid did not recommend any interventions because Plaintiff's brain MRI, EEG, and echo, were all negative.  Id.

On December 13, 2001, surgeon, Dr. Casillas, stripped Plaintiff's bilateral lower extremities of varicose veins (R. at 116).  Plaintiff "was transferred to the recovery room in stable condition fully awake and alert" (R. at 117).

Plaintiff met with Dr. Bonaventura on January 31, 2002, at the VA Clinic (R. at 113).  Dr. Bonaventura found Plaintiff was doing very well after surgery and his wounds were healed.  Id.  Plaintiff complained of some pain.  Id.  Dr. Bonaventura opined that Plaintiff's pain was "probably … related to extensive dissection of the procedure including probably some unavoidable superficial nerve dissection injury."  Id.  Dr. Bonaventura recommended Plaintiff use compression stockings for the time being and visit the vascular surgery clinic in two months.  Id.

Plaintiff went to the Mexico Family Health Center on April 2, 2002, complaining of pain and a burning sensation in his arms (R. at 101).  Plaintiff was instructed to take ibuprofen and try a tennis elbow brace (R. at 102).  Plaintiff was advised to attend physical therapy if his pain worsened.  Id.  The treatment notes were sent to Dr. Hannah.  Id.

5

Plaintiff met with surgery Resident, Dr. Anderson, on April 4, 2002, as a follow up to his surgery (R. at 111-112).  Plaintiff complained of shooting pains in his leg (R. at 111).  Dr. Anderson instructed Plaintiff to continue using his compression stockings and told him the pain would likely subside over time (R. at 112).  He did, however, note that in some instances the pain would not subside and advised Plaintiff to take ibuprofen as needed.  Id.  Dr. Anderson also requested a thyroid exam as Plaintiff had gained weight since the surgery and continued to have swelling in his lower extremity.  Id.

On April 15, 2002, Plaintiff met with family nurse practitioner-certified, Mary Ann Perlman, at the VA Clinic (R. at 110-111).  Plaintiff complained of an aching pain from his elbows to his hands and a tingling sensation in his wrists (R. at 110).  Ms. Perlman noted that Plaintiff had previously been diagnosed with tendonitis.  Id.  Ms. Perlman recommended Plaintiff use wrist splints, increase his Motrin, use moist heat, and avoid overuse (R. at 111).  If Plaintiff did not notice an improvement, nerve conduction studies would be done.  Id.  Ms. Perlman also drew a thyroid panel that had been requested by Dr. Anderson (R. at 110).  It was also noted at that time that Plaintiff weighed 236 pounds.  Id.

Plaintiff underwent a chest x-ray and lumbar sacral spine x-ray on May 20, 2002 (R. at 127).  Radiologist, Dr. Kotval, the physician who completed the exam, found that the chest x-ray indicated an "[u]nfolded aorta.  No active lung disease."  Id.  Plaintiff's lumbar sacral spine x-ray showed that, "[n]o bony or disc space pathology [was] identified."  Id.  Plaintiff also underwent a pulmonary function test that same day (R. at 122). The test indicated "mild large airway obst[ruction]."  Id.

6

Plaintiff met with nurse practitioner, Ms. Perlman, again on June 20, 2002 (R. at 189). Plaintiff complained of pain in his wrist and arm as well as paresthesias (R. at 188). Plaintiff also stated that the wrist splints did not help, he was too busy to attend physical therapy, and he did not often wear his compression stockings because his legs felt better without them. Id. Ms. Perlman noted that Plaintiff was obese, weighing 242 pounds. Id. Ms. Perlman recommended nerve conduction studies for Plaintiff's bilateral carpal tunnel and referred him to an orthopedist. Id.

Plaintiff met with Samuel Nord, Ph.D. and Neurologist, Dr. Bragdon, at the VA Clinic, on August 8, 2002[11] (R. at 187). Plaintiff's electromyogram ("EMG") scan was reviewed (R. at 186); Dorland's at 616. The EMG indicated that Plaintiff had "[m]oderate, chronic, median neuropathy at each wrist…. [and n]o EMG evidence of an ulnar neuropathy or a lower cervical radiculopathy" (R. at 187).

On September 20, 2002, Plaintiff met with David Sussman, D.O.,[12] at the VA Clinic (R. at 186). Plaintiff complained of pain in his forearm. Id. Based on Plaintiff's August 8, 2002 EMG, Dr. Sussman diagnosed "[b]ilateral median nerve neuropathy." Id. Dr. Sussman noted that Plaintiff had requested he fill out a disability report from the Social Security Administration ("SSA"), and also write a note stating he is able to return to work (R. at 185). However, Dr. Sussman refused to fill out the disability report because he "ha[d] some doubt that [Plaintiff] is experiencing [t]rue [sic][13] carpal tunnel

---

[11] The report was signed by Dr. Nord on August 8, 2002, and co-signed by Dr. Bragdon on August 9, 2002 (R. at 187). It is therefore unclear from the record exactly when Plaintiff was at the Clinic and who he met with.
[12] Doctor of Osteopathy. Dorland's at 567.
[13] A hole punch eliminated three letters and/or spaces before "rue" (R. at 186). This Court assumes the word was "true" based on context.

syndrome and as such, I will not submit the [pap]erwork [sic][14] that has been presented

to me from the Social Security Administration" (R. at 186).  Dr. Sussman recommended

Plaintiff follow up in one month with nurse practitioner, Ms. Pearlman.  Id.

Plaintiff went to the Oswego Hospital on November 20, 2002 (R. at 197).  Plaintiff

was diagnosed with "acute strain trunkal musculature"[15] and prescribed Vicodin (R. at

198).  Plaintiff underwent a chest multi view scan while at the Hospital (R. at 203).  Dr.

Lee, the physician who completed the scan, noted "[n]o active disease.  Small nodular

density in the left base, . . . ."  Id.  Dr. Lee also completed a scan of Plaintiff's thoracic

spine.  Id.  He found "[d]egenerative changes with spur formation noted multiple levels

of the thoracic spine. . . . Otherwise unremarkable thoracic spine."  Id.

Plaintiff met with urologist, Dr. Nsouli, on April 3, 2003[16] (R. at 231).  Plaintiff

complained that his leg pain was worse than before surgery (R. at 230).  Plaintiff stated

he did not wear his compression stockings because they would fall down.  Id.  Dr.

Nsouli recommended Plaintiff continue to take ibuprofen and Tylenol for pain and also

see the prosthetics clinic to have stockings refit (R. at 231).

Plaintiff met with nurse practitioner, Ms. Perlman, again on June 5, 2003 (R. at

229).  Plaintiff's chief complaint was pain in both his hips (R. at 228).  Plaintiff also

complained that his legs hurt all the time, but that his wrists did not hurt.  Id.  Ms.

Perlman diagnosed "[p]ossible bilat[eral] trocanteric bursitis . . . ." (R. at 229).  Plaintiff

was prescribed Mobic,[17] and told to apply moist heat.  Id.  Ms. Perlman also

---

[14] A hole punch eliminated three letters and/or spaces before "erwork" (R. at 186).  This Court assumes the word was "paperwork" based on context.
[15] It appears there may be more to the diagnosis, but it was not legible (R. at 198).
[16] It is unclear from the record where Plaintiff met with Dr. Nsouli (R. at 230-232).
[17] Trademark for meloxicam, an anti-inflammatory.  *Dorland's* at 1189.

recommended physical therapy, but Plaintiff stated that it would cause transportation and work problems.  Id.

Apparently, Plaintiff was admitted to the Syracuse VA Medical Center on a complaint involving his cardiovascular system.[18]  Plaintiff was discharged from the Syracuse VA Medical Center on August 15, 2003 (R. at 190).  Plaintiff was diagnosed with supraventricular tachycardia.[19]  Id.  Plaintiff was instructed to avoid caffeine, refrain from work and heavy exertion for five days, and take Atenolol,[20] Aspirin, and Meloxicam[21] (R. at 190-191).

On November 11, 2003, Dr. Davis[22] completed a medical source statement ("MSS") of ability to do work-related activities (R. at 238-241).  Dr. Davis stated that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty pounds, and had no impairments to standing, walking, sitting, pushing, or pulling (R. at 238-239).  Dr. Davis stated Plaintiff was occasionally limited in his ability to climb, balance, kneel, crouch, crawl, and stoop (R. at 239).  Dr. Davis also found that Plaintiff had no manipulative, visual/communication or environmental limitations (R. at 240-241).

**Independent Medical Examiners**

On May 20, 2002, Plaintiff underwent an internal examination with consultative independent medical examiner ("IME"), Dr. Rayani, at the request of the SSA (R. at 128).  Dr. Rayani found that Plaintiff was 5'6" without shoes and weighed 230 pounds

---

[18] The record does not contain any intake or treatment notes from Plaintiff's stay at the Syracuse VA Medical Center so it is not possible to determine what condition led to his admittance.
[19] A rapid heartbeat.  *Dorland's* at 1890.
[20] Treats hypertension, chronic angina pectoris, myocardial infarction, and cardiac arrhythmias;" *Dorland's* at 173-174.
[21] An anti-inflammatory.  *Dorland's* at 1143.
[22] Dr. Davis is not mentioned elsewhere in the record and there is no indication what medical facility Dr. Davis is affiliated with.  Dr. Davis is also not mentioned in Plaintiff's Brief, Defendant's Brief, or the ALJ's decision.

(R. at 129).  Dr. Rayani noted that Plaintiff's EKG showed a normal sinus rhythm and

the ventilation test indicated that Plaintiff "[p]robably [had] mild large obstructive airway

disease" (R. at 131).  Plaintiff's x-rays showed "no bony or disc space pathology . . .

[and] no active lung disease."  Id.  Dr. Rayani diagnosed Plaintiff with "1.  Persistent

pain in the legs and arms.  2.  Obesity."  Id.  In his MSS, Dr. Rayani opined that Plaintiff:

> has mild limitations for sitting and mild to moderately limited for standing,
> walking, and climbing stairs as well as for the use of his upper extremities
> for fine and gross motor activities.  There is no limitation for household
> activities or personal grooming and no limitations for speech, vision, or
> hearing.

(R. at 131-132).  Dr. Rayani also opined that Plaintiff had a guarded prognosis

(R. at 131).

Plaintiff met with consultative IME Jeanne Shapiro, Ph.D., at the request of the

SSA, on June 21, 2002,[23] for an organicity evaluation (R. at 103-107).  Dr. Shapiro

administered a standardized intelligence test (WAIS-III), which indicated that Plaintiff

had a verbal scale IQ of 69, a performance scale IQ of 72, and a full scale IQ of 67 (R.

at 105).  Dr. Shapiro diagnosed Plaintiff with Axis II, mild mental retardation (R. at 106).

In her MSS, Dr. Shapiro stated that:

> [v]ocationally, the claimant appears to be capable of following,
> understanding, and remembering simple instructions in directions.  Barring
> any medical contraindications, he appears to be capable of performing
> simple tasks with supervision and independently.  Given his overall level
> of cognitive functioning, he would have difficulty with more complex tasks,
> instructions or directions.  He appears to be capable of maintaining
> attention and concentration for tasks and regularly attending to a routine
> and maintaining a schedule.  He appears to be capable of making
> appropriate decisions.  He appears to be capable of learning some new

---

[23] The report was dated June 1, 2001 (R. at 103-107).  However, the ALJ correctly noted that the report
referred to examinations and treatments beginning in August 2001 (R. at 17, 103-104).  The ALJ
assumed that the examination was in fact given in June 1, 2002, and this Court will do the same (R. at
17).

tasks.  He appears to be able to relate to and interact appropriately with others.  He appears to be capable of dealing with stress.

Id.  Dr. Shapiro "recommended that [Plaintiff] become involved in vocational training and subsequent job coaching taking into consideration the claimant's level of intellectual functioning."  Id.  Dr. Shapiro opined that Plaintiff had a fair prognosis and would be incapable of managing his own money (R. at 107).

**RFC Analysis**

Dr. Seok completed a physical residual functional capacity ("RFC") assessment, at the request of the SSA, on August 6, 2002 (R. at 135-142).  In it, Dr. Seok found that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight hour workday, sit about six hours in an eight hour workday, and had an unlimited ability to push and/or pull, other than as shown for lift and/or carry (R. at 136).  Dr. Seok also found that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations, with the exception that Plaintiff should avoid concentrated exposures of fumes, odors, dusts, gases, poor ventilations, etc., due to his obstructive airway disease (R. at 137-139).

On August 19, 2002, C. Richard Nobel, Psy.D., completed a mental RFC assessment at the request of the SSA (R. at 143-144).  Dr. Nobel found that Plaintiff was generally not significantly limited in the understanding and memory category, with the exception that he was markedly limited in his ability to understand and remember detailed instructions (R. at 143).  Dr. Nobel found that Plaintiff was generally not significantly limited in the sustained concentration and persistence category, with the following exceptions: a) Plaintiff was moderately limited in his ability to maintain

attention and concentration for extended periods; b) Plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and c) he was markedly limited in his ability to carry out detailed instructions.  Id.  Dr. Nobel found that Plaintiff was not significantly limited in the social interaction category (R. at 144).  Finally, Dr. Nobel found that Plaintiff was generally not significantly limited in the adaption category, with the exception that Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting.  Id.

That same day, Dr. Nobel also filled out a psychiatric review technique, at the request of the SSA (R. at 146).  Dr. Nobel diagnosed Plaintiff with a "cognitive disorder NOS[24]/actual functioning in the BIF[25] range", and mild mental retardation (R. at 147, 150).  Dr. Nobel found that Plaintiff had mild restriction of daily living activities, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and never had repeated episodes of deterioration, each of extended duration (R. at 156).  Dr. Nobel noted that Plaintiff was "[c]urrently testing out in the high MR[26] to BIF range but functioning seems higher. . . . There is no evidence of cognitive impairment [before] age 22.  He has a work h[istory and] was in the service.  He is not mentally retarded" (R. at 158).

## Discussion

---

[24] Not otherwise specified.
[25] Borderline intellectual functioning.
[26] Mild retardation.

**Legal Standard of Review:**

6.      A court reviewing a denial of disability benefits may not determine *de novo*

whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v.

Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the

Commissioner's determination will only be reversed if it is not supported by substantial

evidence or there has been a legal error. See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir.

1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is

evidence that amounts to "more than a mere scintilla," and it has been defined as "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.

2d 842 (1971).  Where evidence is deemed susceptible to more than one rational

interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v.

Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

7.      "To determine on appeal whether the ALJ's findings are supported by substantial

evidence, a reviewing court considers the whole record, examining evidence from both

sides, because an analysis of the substantiality of the evidence must also include that

which detracts from its weight."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258

(2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must

be sustained "even where substantial evidence may support the plaintiff's position and

despite that the court's independent analysis of the evidence may differ from the

[Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In

other words, this Court must afford the Commissioner's determination considerable

deference, and may not substitute "its own judgment for that of the [Commissioner],

13

even if it might justifiably have reached a different result upon a *de novo* review."

Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

8.     The Commissioner has established a five-step sequential evaluation process to

determine whether an individual is disabled as defined under the Social Security Act.

See 20 C.F.R. §§ 404.1520, 416.920.  The United States Supreme Court recognized

the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct.

2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing

whether a claimant is disabled.

9.     This five-step process is detailed below:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not, the
> [Commissioner] next considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental ability to do
> basic work activities.  If the claimant has such an impairment, the third
> inquiry is whether, based solely on medical evidence, the claimant has an
> impairment which is listed in Appendix 1 of the regulations.  If the claimant
> has such an impairment, the [Commissioner] will consider him disabled
> with-out considering vocational factors such as age, education, and work
> experience; the [Commissioner] presumes that a claimant who is afflicted
> with a "listed" impairment is unable to perform substantial gainful activity.
> Assuming the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work.  Finally, if the
> claimant is unable to perform his past work, the [Commissioner] then
> determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v.

Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

10.    While the claimant has the burden of proof as to the first four steps, the

Commissioner has the burden of proof on the fifth and final step.  See Bowen, 482 U.S.

at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).  The final step of this

inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the

claimant's job qualifications by considering his physical ability, age, education, and work

experience.  Second, the Commissioner must determine whether jobs exist in the

national economy that a person having the claimant's qualifications could perform.  See

42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458,

460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

11.     In this case, the ALJ made the following findings with regard to factual

information as well as the five-step process set forth above:

1.  The claimant met the disability insured status requirements of the Act
    on August 5, 2001, his alleged date of disability, and has acquired
    sufficient quarters of coverage to remain insured through at least
    December 31, 2006 [sic].[27]
2.  The claimant did not engage in substantial gainful activity within a year
    of his alleged date of disability onset.
3.  The medical evidence establishes that the claimant has severe
    impairments consisting of s/p varicose vein removal and bilateral
    median neuropathy, which are severe but which do not meet or equal
    the criteria of any of the impairments in Appendix 1, Subpart P,
    Regulations No. 4.
4.  The claimant's statements concerning his impairments and their impact
    on his ability to work are not credible.
5.  The claimant retains the residual functional capacity to lift 10 pounds
    frequently and 20 pounds occasionally, to stand, sit, and walk six hours
    in an eight-hour day, and push/pull equal to lifting.  The claimant has a
    need to avoid detailed and complex tasks.
6.  The claimant's past work as a sorter in paper processing was unskilled
    work at light exertion.
7.  The claimant retains the capacity to perform the duties of his past
    relevant work.

(R. at 20-21).  Ultimately, the ALJ found that Plaintiff had not met the requirements of

disability, as defined by the Act, at any time through the date of his decision (R. at 21).

**Plaintiff's Allegations**

---

[27] Plaintiff's date last insured was December 31, 2001, not December 31, 2006, as the ALJ found (R. at
27, 20).

15

Plaintiff alleges, generally, that the decision of the ALJ was based on legal error and not supported by substantial evidence.  Specifically, Plaintiff argues that the ALJ erred in 1) finding Plaintiff had borderline intellectual functioning that was not severe; 2) finding Plaintiff did not meet listing 12.05C; 3) not obtaining an MSS or RFC assessment from Plaintiff's treating physicians; 4) analyzing Plaintiff's credibility; 5) finding Plaintiff capable of his doing his past work; and 6) not following the Medical-Vocational Guidelines as a Framework for finding Plaintiff disabled.

**Allegation 1: The ALJ Erred in his Analysis of Plaintiff's Mental Impairment**

12.    Plaintiff argues that the ALJ erred in a) finding Plaintiff had borderline intellectual functioning, instead of mild mental retardation; and b) finding Plaintiff's mental impairment not severe.  See Plaintiff's Brief, pp. 8-11.  Defendant responds by arguing that substantial evidence supported the ALJ's finding that Plaintiff had borderline intellectual functioning and it was not severe.  See Defendant's Brief, pp. 5-9.

**a)  The ALJ's Finding of Borderline Intellectual Functioning**

Plaintiff argues that the ALJ substituted his own opinion when he found Plaintiff had borderline intellectual functioning and not mild mental retardation.  See Plaintiff's Brief, pp. 8-11.  Defendant responds by arguing that the ALJ's finding was supported by substantial evidence.  See Defendant's Brief, pp. 5-9.

The ALJ cannot substitute his lay opinion for that of a competent physician. Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (quoting McBrayer v. Sec'y of Health & Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)).

The only physicians to give a diagnosis of Plaintiff's mental impairments were Dr. Shapiro, the consulting examining physician, and Dr. Nobel, the non-examining review

physician (R. at 107, 146).  Dr. Shapiro diagnosed Plaintiff with mild mental retardation

(R. at 106).  Dr. Nobel diagnosed Plaintiff with a cognitive disorder, with functioning in

the borderline intellectual functioning range, and mild mental retardation (R. at 147,

150).  Dr. Nobel also noted that Plaintiff was "[c]urrently testing out in the high MR[28] to

BIF[29] range but functioning seems higher" (R. at 158).

> In determining Plaintiff's mental limitation, the ALJ:
>
> reject[ed] the [] diagnosis of mental retardation, as there is no allegation or
> evidence that the claimant suffers from any deficits in adaptive functioning
> during the period at issue or in the period prior to age 22.  In the absence
> of any such finding, the diagnosis of mental retardation is not supported.
> However, resolving all doubt, [Plaintiff] may be functioning in the range of
> borderline intellectual functioning.

(R. at 17).

In making this determination, the ALJ effectively substituted his diagnosis of

borderline intellectual functioning for Dr. Shapiro's diagnosis of mild mental retardation

and Dr. Nobel's finding of mild mental retardation,[30] because the ALJ did not find "any

deficits in adaptive functioning" (R. at 17).  This was error.  See Rosa, 168 F.3d at 79

(finding the ALJ erred in his disability analysis when he rejected the opinion of plaintiff's

physician because that physician "did not report findings of muscle spasm to

corroborate any loss of motion") (internal quotations omitted); Wagner v. Sec'y of Health

& Human Servs., 906 f.2d 856, 861 (2d Cir. 1990) (finding the ALJ erred in determining

that plaintiff did not have hemiplegic migraines because "[h]eadaches and left-sided

weakness were *not* among the symptoms disclosed") (internal quotations omitted).

---

[28] Mild retardation.

[29] Borderline intellectual functioning.

[30] Plaintiff had a verbal scale IQ standard score of 69, a performance scale IQ standard score of 72, and
a full scale IQ standard score of 67 (R. at 105).  A full scale IQ score of 67 indicates a diagnosis of mild
mental retardation.  *Dorland's* at 1655.

Moreover, in the course of his decision, the ALJ appears to have discounted both Dr. Shapiro's and Dr. Nobel's opinions.  First, he rejected Dr. Shapiro's diagnosis of mental retardation, as previously stated (R. at 17).  Next, when discussing the severity of Plaintiff's borderline intellectual functioning, the ALJ appears to have also discounted the opinion of Dr. Nobel (R. at 19).  Dr. Nobel found that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace (R. at 156).  The ALJ rejected this assessment as well (R. at 19).

Therefore, not only did the ALJ discount the opinions of the two physicians who assessed Plaintiff's mental limitations, he also substituted his lay opinion for competent medical evidence.  Under the circumstances "there is a reasonable basis for doubt whether the ALJ applied the correct legal principles…" and the ALJ's decision cannot be affirmed.  Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### b)  The ALJ's Finding of Not Severe

Plaintiff also argues that the ALJ erred in finding Plaintiff's mental limitation not severe.  See Plaintiff's Brief, pp. 8-11.  Defendant responds by arguing that the ALJ's finding was supported by substantial evidence.  See Defendant's Brief, pp. 5-9.

At this severity step, only de minimis claims may be properly screened out. Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).  A finding of not severe is appropriate when an impairment, or combination of those impairments "does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).

If the impairment is mental, the ALJ must complete a "special technique" to determine whether the mental impairments rises to the level of severe.  20 C.F.R. §§

18

404.1520a(a); 416.920a(a).  The special technique encompasses four areas: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. §§ 404.1520a(c)(3); 416.920a(c)(3).  These areas are rated on a scale of "none, mild, moderate, marked, and extreme."  20 C.F.R. §§ 404.1520a(c)(4); 416.920a(c)(4).  If an individual's impairment results in none, or mild, for the first three categories and none in the fourth, a finding of non-severe is generally appropriate.  20 C.F.R. §§ 404.1520a(d)(1); 416.920a(d)(1).

The only physician to complete a special technique analysis was the non-examining consulting physician, Dr. Nobel (R. at 156).  Dr. Nobel found mild restrictions of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of deterioration, each of extended duration (R. at 156).  Because Dr. Nobel determined that Plaintiff was moderately limited in a category, this would have warranted a finding of severe.  However, without completing a special technique analysis of his own, the ALJ rejected Dr. Nobel's moderate finding because "[d]uring several difficult testing situations, the psychological and pulmonary testing for example, which require the ability to understand and attend, the claimant experienced no deficits" (R. at 19).

Plaintiff argues that the ALJ substituted his own opinion when he found Plaintiff's mental impairment to not be severe.  However, the Court cannot make a determination as to whether the ALJ was correct in his finding of non-severe, because he failed to complete the special technique and rejected the opinion of the one physician who furnished one.  Under the circumstances, this Court cannot deem this failure harmless error.  See Kohler v. Astrue, 546 F.3d 260 (2d Cir. 2008) (finding the ALJ's failure to

complete a special technique analysis not harmless error because the court "c[ould]

neither identify findings regarding the degree of Kohler's limitations in each of the four

functional areas nor discern whether the ALJ properly considered all evidence relevant

to those areas").

Accordingly, it is recommended that this case be remanded to a) reassess

Plaintiff's mental limitation, and b) complete a special technique analysis to assess

severity.

### Allegation 2: The ALJ Erred In Finding Plaintiff Failed to Meet Listing 12.05C (Mental Retardation) and Failed to Explain His Analysis

13.     Plaintiff argues that the ALJ erred in failing to find Plaintiff met listing 12.05C, and

also in failing to explain his analysis.  See Plaintiff's Brief, pp. 11-12.  Defendant

responds by arguing that substantial evidence supports the ALJ's finding and his

analysis was sufficient.  See Defendant's Brief, pp. 5-9.

"Where the claimant's symptoms as described in the medical evidence appear to

match those described in the Listings, the ALJ must provide an explanation as to why

the claimant failed to meet or equal the Listings."  Brown ex rel. S.W. v. Astrue, No.

1:05-CV-0985, 2008 WL 3200246, at *10 (N.D.N.Y. Aug. 5, 2008) (quoting Giles v.

Chater, No. 95-CV-0010E, 1996 WL 116188, at *5 (W.D.N.Y. Jan. 8, 1996)).

Plaintiff argues that the ALJ erred in failing to find he met the requirements for

Listing 12.05C.  Listing 12.05C states:

> Mental retardation: Mental retardation refers to significantly subaverage
> general intellectual functioning with deficits in adaptive functioning initially
> manifested during the developmental period; i.e., the evidence
> demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the
> requirements in A, B, C, or D are satisfied.

. . .
    C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a
    physical or other mental impairment imposing an additional and significant
    work-related limitation of function;

20 C.F.R. Pt. 404, Subpt. P, App. 1.  Because the ALJ did not find that Plaintiff's mental

impairments were severe, he did not consider whether Plaintiff met this, or any other

mental Listing.  However, as the Court has previously recommended remand for failure

to appropriately analyze Plaintiff's mental impairments, this issue will not be discussed,

but the Court will instead recommend that this issue be revisited by the ALJ on remand.

### Allegation 3: The ALJ Erred in Not Re-Contacting Plaintiff's Treating Sources for an RFC or MSS Assessment

14.    Plaintiff's next argument is that the ALJ erred in not re-contacting Plaintiff's

treating physicians to obtain an RFC or MSS assessment from them.  See Plaintiff's

Brief, pp. 13-14.  The record reflects that no RFC or MSS was in the record with the

exception of an MSS from Dr. Davis.  Defendant responds by arguing that Plaintiff had

no treating source to re-contact and, alternatively, re-contact was not warranted as

there were sufficient reports of Plaintiff's functional limitations.  See Defendant's Brief,

pp. 9-13.

       The ALJ has an affirmative duty to develop the record.  Echevarria v. Sec'y of

Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982).  This duty exists regardless

of whether Plaintiff has counsel or is continuing pro se. Perez v. Chater, 77 F.3d 41, 47

(2d Cir. 1996).  If the evidence received is not adequate to determine whether an

individual is disabled, additional information must be gathered by first re-contacting

Plaintiff's treating physician.  20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

"The duty to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations."  Dickson v. Astrue, No. 1:04-CV-0511, 2008 WL 4287389, at *13 (N.D.N.Y. Sept. 17, 2008) (citing Devora v. Barnhart, 205 F.Supp.2d 164, 172 (S.D.N.Y. 2002)).  Because of this 'particularly important' duty, the ALJ has an affirmative obligation to make reasonable efforts to obtain from Plaintiff's treating physicians any necessary reports, including an assessment of Plaintiff's RFC.  Dickson, 2008 WL 4287389, at *13.  However, a treating source will not be re-contacted "when we know from past experience that the source either cannot or will not provide the necessary findings."  20 C.F.R. §§ 404.1512(e)(2), 416.912(e)(2).

Plaintiff does not state what treating sources should have been re-contacted. The Court will therefore assume that Plaintiff is referring to the two treating sources he mentions in a report when asking for a hearing, Dr. Hannah and the Oswego VA Clinic (R. at 86-87).

"The Second Circuit has defined a treating source as the claimant's own physician, osteopath or psychologist (including an outpatient clinic and health maintenance organization) who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual."  Sokol v. Astrue, No. 04-CV-6631, 2008 WL 4899545, at *12 (S.D.N.Y. Nov. 12, 2008) (quoting Schisler v. Sullivan, 3 F.3d 563, 569 (2d Cir. 1993)) (internal quotations removed); see also Cruz v. Barnhart, No. 04 CIV 9011, 2006 WL 1228581, at *14 (S.D.N.Y. May 8, 2006) (finding the ALJ sufficiently developed the record by twice contacting Plaintiff's treating source, an OB/GYN Clinic).

Accordingly, Plaintiff's VA Clinic can be considered a treating source.  As such, it should have been re-contacted by the ALJ for an MSS or RFC assessment.[31]  Failure to re-contact to attempt to obtain an RFC or MSS is error and grounds for remand.  See Hopper v. Comm'r of Soc. Sec., No. 7:06-CV-0038, 2008 WL 724228, at *11 (N.D.N.Y. Mar. 17, 2008) (remanding, in part, because the ALJ failed to re-contact Plaintiff's treating physicians after noting that the record did not contain an RFC or MSS from any of Plaintiff's treating physicians); Dickson, 2008 WL 4287389, at *9 (remanding, in part, for failure to re-contact Plaintiff's treating physician to request an RFC assessment).

The Court notes that a physician at the VA Clinic, Dr. Sussman, did refuse one request by the Plaintiff to fill out SSA paperwork (R. at 186).  However, the Court cannot find that a single statement, by only one of the many physicians Plaintiff saw at the VA clinic, amounts to the ALJ having "know[n] from past experience that the source either cannot or will not provide the necessary findings."  20 C.F.R. §§ 404.1512(e)(2), 416.912(e)(2).

As for Dr. Hannah, this Court also finds error.  Plaintiff stated that Dr. Hannah, at the Mexico Health Center, was one of his two treating physicians with his last visit taking place in July 2002 (R. at 86).  However, the only treatment record from the Mexico Health Center was dated April 1, 2002 (R. at 101-102).  Notably, the record is not even clear as to whether Plaintiff in fact saw Dr. Hannah on that date.  Id.  There are no other records from, or pertaining to, Dr. Hannah.  These gaps in the record require the ALJ to re-contact Dr. Hannah to see what, if any, medical reports are available.  See

---

[31] This Court notes that there is an MSS from Dr. Davis (R. at 238-241); but it is unclear for whom Dr. Davis worked.  Thus, the court cannot credit the MSS as having come from a treating source.  If it develops that Dr. Davis did in fact work for the VA, the ALJ has an obligation, on remand, to assign appropriate weight to that treating source opinion.

Gibson v. Barnhart, 212 F.Supp.2d 128, 182-183 (W.D.N.Y. 2002) (remanding, in part, for failure to fill gaps in the record with respect to the plaintiff's treating physician when the plaintiff testified she had seen the physician two or more times).  The Court also instructs the ALJ to request an MSS or RFC assessment from Dr. Hannah.

Based on this deficiency, it is recommended that this case be remanded to allow the ALJ to fulfill his duty to develop the record by requesting a) an MSS or RFC from the VA Clinic; b) treatment records from Dr. Hannah; and c) an MSS or RFC from Dr. Hannah.

**Allegation 4: The ALJ Erred in Assessing Plaintiff's Credibility**

15.     Plaintiff argues that the ALJ's credibility analysis a) did not conform to SSR 96-7p, or 20 C.F.R. §§ 404.1529, 416.929; and b) did not take into consideration Plaintiff's good work history.  See Plaintiff's Brief, pp. 14-17.  Defendant responds by arguing that the ALJ properly assessed Plaintiff's contentions of pain in relation to the objective medical evidence.  See Defendant's Brief, pp. 13-16.

**a)  The ALJ's Credibility Analysis Did Not Conform to the
Commissioner's Regulations**

"An administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence."  Lewis v. Apfel, 62 F.Supp.2d 648, 651 (N.D.N.Y. 1999) (internal citations omitted).   Thus, the ALJ must follow a two-step process to evaluate Plaintiff's contention of pain, set forth in SSR 96-7p, 1996 WL 374186, at *2:

24

First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) . . . that could reasonably be expected to produce the individual's pain or other symptoms . . . .

Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

According to 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii), if Plaintiff's pain contentions are not supported by objective medical evidence, the ALJ must consider the following factors in order to make a determination of Plaintiff's credibility concerning his pain:

1. [Plaintiff's] daily activities;
2. The location, duration, frequency and intensity of [Plaintiff's] pain or other symptoms;
3. Precipitating and aggravating factors;
4. The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
5. Treatment, other than medication [Plaintiff] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
6. Any measure [Plaintiff] use[s] or ha[s] used to relieve . . . pain or other symptoms;
7. Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

If the ALJ finds Plaintiff's pain contentions not credible, he must state his reasons "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." Young v. Astrue, No. 7:05-CV-1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008) (quoting Brandon v. Bowen, 666 F.Supp 604, 608 (S.D.N.Y. 1987)).  Here, the ALJ found that Plaintiff was "not credible," but failed to complete the necessary analysis (R. at 19).

First, the ALJ appears to have found the following medically determinable impairments, although he never specifically makes the finding as required: severe

25

impairments "of varicose vein removal and bilateral median neuropathy" and a non-severe impairment of borderline intellectual functioning (R. at 18, 17).  The next step would have been to determine whether those medically determinable impairments could reasonably have caused Plaintiff's pain, but the ALJ failed to make such a finding.  Failure to make this finding is error that cannot be cured by an analysis of the seven factors.  See Hogan v. Astrue, 491 F.Supp.2d 347, 352-353 (W.D.N.Y. 2007) (remanding, in part, because the ALJ failed to find whether plaintiff's impairments "could reasonably be expected to produce the pain … she alleged" despite noting that the ALJ "carefully review[ed]" the seven factors set forth in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii)).

Plaintiff also argues that the ALJ erred in analyzing the seven factors laid out in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).  The Court cannot find error in the ALJ's analysis of the seven factors.  The ALJ appropriately discussed two of the factors, medications and daily activities, and also discussed inconsistent statements made by Plaintiff.  See  Meglino v. Comm'r of Soc. Sec, No. 5:06-CV-968, 2008 WL 2097221, at *10 (N.D.N.Y. May 19, 2008) ("find[ing] substantial evidence to support the ALJ's credibility" analysis, which was based, in part, on inconsistent statements made by plaintiff).  However, this will not absolve the ALJ of other errors in his credibility analysis, discussed both above and below.

### b)  Plaintiff's Good Work History

Plaintiff also argues that the ALJ failed to take into account his good work history in his credibility analysis.  See Plaintiff's Brief, p. 15.

26

In addition to the seven factors noted above, an ALJ is required to take into account a claimant's work history as, "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983). In assessing the credibility of a Plaintiff's contention of pain, the ALJ is told to consider, among other things, "prior work record and efforts to work." SSR 96-7p, 1996 WL 374186, at *5. It does not appear from the ALJ's decision that he considered Plaintiff's work history in his credibility analysis (R. at 16). Because Plaintiff has an extensive, albeit low income, work history dating back to 1965, to not consider this when assessing Plaintiff's credibility was error (R. at 40). See Wilber v. Astrue, No. 07-CV-56S, 2008 WL 85037, at *3 (W.D.N.Y. Mar. 28, 2008) (remanding, in part, for failure to consider plaintiff's good work history of over twenty years in his credibility analysis).

Therefore, it is recommended that this case be remanded to allow the ALJ an opportunity to a) reassess Plaintiff's credibility, and b) to include Plaintiff's work history in that analysis.

### Allegation 5: The ALJ Erred in Finding Him Capable of Performing His Past Relevant Work

16.    Plaintiff argues that the ALJ erred in finding him capable of his past work as a sorter in a paper processing plant without requesting additional information from him. See Plaintiff's Brief, pp. 17-18. Defendant responds by arguing that the ALJ's reliance on the Dictionary of Occupational Titles ("DOT") was proper. See Defendant's Brief, pp. 16-18.

An individual is not disabled if he can perform his past relevant work, either as he actually performed it, or as it is generally performed in the national economy.  SSR 82-61, 1982 WL 31387, at *1-2; see also Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003) (citing Jock v. Harris, 651 F.2d 133, 135 (2d Cir. 1981)) ("the claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally").

Here, the ALJ found the following for Plaintiff's RFC: Plaintiff "retains the residual functional capacity to perform the exertional demands of light work including lifting 10 pounds frequently and 20 pounds occasionally, standing, sitting, and walking six hours in an eight hour day, and push/pulling equal to lifting.  He needs to avoid complex and detailed tasks" (R. at 20).  Plaintiff stated in his work history report that he has previous work experience of a sorter in a recycling paper company (R. at 54-55).  The ALJ then applied the DOT and determined the capacity needed to complete the job of sorter in a paper processing company as it is generally completed in the economy (R. at 20).  The ALJ found that a job sorter in a paper processing company had "strength demands of light work and a specific preparation designation of 2, representative of unskilled work. As [Plaintiff's] residual functional capacity includes the capacity for light exertion not involving complex tasks, he retains the capacity to perform his past relevant work as it is generally performed."  Id.

Plaintiff appears to be arguing that the ALJ erred in not obtaining more information from Plaintiff about his past work before finding him not disabled.  However, the ALJ is free to find an individual not disabled if he can perform his past work as it is generally performed in the national economy.  SSR 82-61, 1982 WL 31387, at *3.  SSR

82-61 also specifically states that in such an analysis, the DOT may be relied on, as the ALJ did.  Id.  However, because the Court has previously recommended remand to reassess severity, re-contact Plaintiff's treating physicians, and re-assess Plaintiff's credibility, the ALJ's RFC is necessarily flawed.  Therefore, the Court cannot reach a decision as to whether the ALJ appropriately relied on the DOT in finding Plaintiff not disabled.

### Allegation 6: The ALJ Erred in Not Finding Plaintiff Disabled Under Medical-Vocational Rule 202.06

17.     Plaintiff's final argument is that the ALJ erred in not following Medical-Vocational Rule 202.06 as a framework for finding Plaintiff disabled.  See Plaintiff's Brief, pp. 18-19.  Defendant responds by arguing that there was no need to proceed to the fifth step, when the Medical-Vocational Rules would have been applied.  See Defendant's Brief, pp. 18.

Here, the ALJ did not make a determination at step five, when the Medical-Vocational Rules would have been applied, because he found Plaintiff not disabled at step four (R. at 20).  Because the Court is recommending remand for errors throughout the five step process, this Court will not reach a decision as to whether the ALJ erred by not reaching step five.

## Conclusion

Based on the foregoing, it is recommended that Defendant's motion for judgment on the pleadings should be DENIED; Plaintiff's cross motion for judgment on the pleadings should be DENIED in part and GRANTED in part and REMANDED for reconsideration.

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge

Syracuse, New York

DATED:       March, 2009

## ORDERS

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an**

**extension of such time waives the right to appeal the District Court's Order.**

 *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985);   *Small v.*
*Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);   *Wesolek v.*
*Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and recommendation to the attorneys for
the Plaintiff and the Defendants.

SO ORDERED.

Victor E. Bianchini
United States Magistrate Judge

Syracuse, New York

DATED:      March5, 2009

31